OEA, OEA, OEA, all persons having any manner of formal business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Let's be seated. Good morning and welcome to the Court of Appeals. We're prepared to hear three cases for argument this morning for this panel and we're going to start with the Rock Springs Plaza v. Investors Warranty of America. Mr. Getson-Dana, did I get that even close? No, it was very close. You are first up. You're in the top 2%. I like that. I'll accept it. May it please the Court. I am Kevin Getson-Dana of Arnold, Golden & Gregory in Atlanta, Georgia, proud to speak today on behalf of Investors Warranty Corporation of America and also Rock Springs Drive, LLC. Just to introduce my co-counsel, my partner, Rebecca Davis, is on your far left, and Sarah Croft in the middle, Chair, is the trial counsel for Rock Springs Drive. And for ease of reference, I've been briefing it this way, I'm going to shorthand this to IWA and RSD and Plaza, if that works for you folks. And if I confuse you, I know you'll ask for clarification. I'll just say quickly, I've been practicing law a long time and I've always wanted to argue in this court. I had a case 20 years ago but didn't get to orally argue it. In 47 years, I've never seen a nicer bunch of court staff, top to bottom, it's unbelievable. I said staff, Your Honor. They are nice. Let me begin. From listening to oral arguments online, I know it's a very hot bench, but if I could just take a minute to sort of frame the issue as we see it. And I think it's easier to get kind of a view of this case from, we zoom out to 20,000 feet. Of course, the issue in the case is the validity of IWA's assignment of its leasehold interest in a 99-year ground lease, which has on it an office building that's part of a bigger office park. It's kind of an interesting case. You've got a case where a lease goes to 2089, is that right? Yes, 2089. Yeah, 2089 and then has an absolute right to lease it out? Sounds pretty good to me, Your Honor.  Isn't that what this case is all about? It is what the case is all about. What's that mean? You can absolutely assign it to Santa Claus or you can assign it to a minor? I mean, someone who's absolutely destitute, can you just do that? And if you do that, then you're out. Yeah. No, I wouldn't argue that at all, Judge, although honestly- But what does absolute mean? Well, the contract doesn't prohibit that, but that's at the far extreme. What's the limitation of that then? Okay, well, that is the question, Your Honor. That is what I want you to answer. That is the question. That's what I want you to answer. And the problem- What is the limitation on your, the manner in which you can assign this contract? And here's my answer. I think I need to reference my answer. No, just give me the answer first. We have to hear answers to our questions. That's fair enough. What is the answer to the question that limits the absolute nature of being able to sign this contract? In other words, if you absolutely can do something, there seems to be nothing that limits that you can do it. I gave some absurd examples, but nonetheless, they fit within the word absolute. I do think- But you know this is a contract. I do, Your Honor. Contracts typically is a meeting of the minds, and people don't get together and say, I have a contract that, you know, I'll allow you to lease at 20.89, but you can assign it to your favorite pet. Right. Whomever. That's not, you know that's not part of the contract.  And I would- No court is going to hold that. So what is the limitation? My answer is that the limitation on an absurdist assignment like that is something like the implied duty of good faith and fair dealing. But I'm going to explain to you why that implied duty- I'm going to give you a chance to explain, but I wanted to kind of get this out of the way up front. Okay. So we could dance around this thing all day long, and then I'm sitting here holding these questions in my head. That's not beneficial. I mean, it's like a courtesy. But we only have just a few minutes here, so let's get right to the nub of this thing. All that extra stuff you want to say, you've got to brief, and everything's in it. We've read these cases. Right. We've read the records, the whole bit. We've had clerks and all that. What we're now doing is getting to the nub of the case, and that's why I went there and said, what is absolute in this case? And when you look at that, you said absurdity. I like that. That you can't be absurd. You can't be absurd. But then you get into- I don't know if it has to go to that level to be an absurdity. It doesn't. But the allegation here says you sent it to a corporation or group that you created after you couldn't pay or didn't want to continue something that wasn't profitable at all. True. And you couldn't figure out a way to get out of it at all, so you created an entity that you own 98 percent of, you control, and you say, well, that's okay, even if it doesn't pay me. And if that entity doesn't pay, you're out, because you gave it to that entity you control. Why is that? Why is that okay? Why is that something that's permitted? Why is that okay? I can answer that by going through the contract with you, Your Honor. Go ahead. Okay? I can answer that by going through the contract with you. But your point is one worth pausing on further just right here. So what restraint is there on the assignment? Is it the point is the trial court imposed a restraint, and the restraint that the trial court imposed was- What was that restraint? That any assignee, in order to have a valid assignment and release, must be capable of performing the lease. Okay? Well, I would call that, we would call that, Your Honor, that is an absurdist example, because that means nothing. What- you have to look at this in context. So you're saying it's okay to serve, to assign someone who's incapable of performing the lease? What I'm saying is that- It's okay to assign somebody a lease that is incapable of performing under the lease? I would say if completely incapable of performing, no, Your Honor. But the assignment here was- the assignment here was made in conjunction with a capital investment in the assignee of three years worth of ground rent. So that's not nothing. That's not nothing at all. And furthermore, the assignment to a subsidiary, a wholly owned subsidiary- Three years of what? Ground rent. So the rent due from my client- The contract runs to 2089. No, no, no. But the point is- So you got three years. You're guaranteed on this. And what happens at the end of three years? What do you got? Well, we don't know. Someone who may be incapable of- Possibly.  But who- Who paid the three years? Yeah. The three years- So there's- Who paid the three years? IWA. Capitalized- So IWA funds this entity- That's right. That they created for three years. That's right. And in three years, what do you got? Well, you don't- no one can say what you got, Your Honor. If you assume- Well, you know what you didn't get the first three years? You didn't get rent from it the first three years because that came from IWA. Well- At the end of the three years, you got what you wanted as indicated in the emails y'all wrote. Given this is worthless, is there any exit strategy on this to get it off the books? Is it even possible to just walk away from the agreement? Sure. And that's what you got. Sure. You walked away from the agreement. So the use of a special purpose entity to limit the owner's liability is a commonplace thing, not only in the real estate industry but in the business world. That's what corporate protection is designed to do. The use of the term exit strategy is a term that any real estate owner would use in regard to their plans to get out of a profitable or unprofitable investment. And every other badge of fraud that Plaza asserted in the trial court, you can flip around and find an absolutely normal business explanation for. In fact, Your Honor, the plaintiff, Plaza, itself is a special purpose entity. Its original tenant was a controlled special purpose entity with limited capitalization that gave my client, IWA, no meaningful recourse when that tenant defaulted on the leasehold mortgage loan. So you have to look at the context. In a 99-year ground lease where my client loaned $30 million to construct a building that the landlord owns whenever this leasehold ends, there is a consideration, there is a form of security there. And the cases cited in our briefs point to that as a reason to allow very free assignment. Okay? So the context is critically important. 99-year lease, leasehold mortgage. The sole security that the lender has in a leasehold mortgage context is the leasehold. And this lease, the underlying ground lease, was specifically written to be financeable. In other words, to be welcoming, to be able to attract a leasehold mortgage lender to construct that building. And then why did Appellate stop communicating with the FLE after this agreement, after this assignment? Well, there was a prior history of litigation between the parties. And one of the reasons was damage. They stopped answering any basic questions about the assignment. Well, I don't think that's the record is accurate on that, Your Honor. They didn't stop answering. They told the identity. What they didn't do is say more about their business plan or the corporate structure. And you're saying that was because they were in litigation? That's because they feared litigation. They feared litigation. And we're going to have litigation. If this judgment is affirmed, we're inviting more litigation. Because the idea of limiting the right to assign in that way with a standardless guideline. What are you going to litigate? Who are you going to litigate it to? Are you going to litigate what we do here? No, no, no. The Supreme Court? No, no, no, no, no, no, no. The point is, if there is a downstream assignment, if you affirm this judgment, and there is a later assignment to someone. Sometimes once we do our work here, it's not something we deal with. That's between you and these companies and the way you're dealing with it. And, I mean, quite frankly, I get your point. We can go through all the legal release in terms of leasehold assignments and how they work. But at the end of the day, we started this conversation out about what is absolute. And we also have the history. And it's not a situation where you're going along. You've got a nice profitable situation. You decide you want to send it to them. There's a reason you want to get out of this. And it seems to be very evident why you want to get out of it. And you obviously couldn't get anyone else to take a non-profitable lease like this. So you create an entity. And when you create an entity, 98% of it you own, you control. And in the instance of it, you didn't pay up front the first three. This entity hasn't paid anything, hasn't done anything. And then here's someone holding a lease saying, well, who made a bargain to do this? It may have been for the benefit to be able to get financing and that sort of stuff. But this cannot be what one would call good faith dealing or at least some type of fairness in a contract. I mean, when you think about it, it's a very crackly way to do something. And I'm not saying you can't prevail. Let's put it this way. It sounds like we've already made up our mind. That's not necessarily true because there's a record to be looked at and facts to look at it. And your argument to an extent is going to be considered because, I mean, we've got to brief. We know how this case is going to turn out. But I want to hear that answer from you today. Right. You know, we don't hear many cases here on the Fourth Circuit. But when we do, there's something particular that we really want you to respond to. And not the underlying legal basis for it, but more the rationale that would refute what the district court did here. And here is that rationale. It comes from the terms of the contract, Your Honor. The contracts were specifically written to give the leasehold lender broad rights to assign and release. The bargain they struck was that we will fund your building as a lender taking sole security in the leasehold. And, you know, the advantage of having access to either take possession of the leasehold or to convey it is to protect the lender's freedom and ability to liquidate value out of that leasehold to recover the shortfall when its loan is defaulted. Okay? That's the bargain. That's what the landlord gives to the lender. That's what the landlord kind of has to give to the lender in the real world marketplace or the lender doesn't step up to the plate and make the loan. That's why the ground lease is written to be financeable with a free right of assignment in Section 5. But the assignment provision at least is limited to third parties. And what was found here was that the entity that was created was an alter ego. In other words, not a third party. So why wasn't that, why doesn't that end the story? Okay. So third party, legally it's a third party. You know, a special purpose entity subsidiary is unquestionably. Our case law in the brief establishes that quite fairly. Maryland is very reluctant to pierce the corporate veil. They're more protective than most jurisdictions. And the case law says that. So it is a separate person. Any subsidiary by definition is a third party to the principles. Look it up in Maryland websites. And you acknowledged at the beginning that there was a covenant of good faith and fair dealing here that applied. In every contract. But does it require a restriction on the right to assign? No. And here's why. Here is why. When you look at the assignment provision in the ground lease, it's in Section 5.2. I have it in front of me. And it's a pretty broad provision, but it does have a restriction. It's hard to understand without reading it 47 times. But what you'll see is that the restriction in the right to assign in Section 5.2 is not in favor of the landlord, but it's in favor of the landlord's fee mortgage lender. So the landlord has his own mortgage on the underlying dirt. And that restriction says the tenant can't, until they build the building, they can't assign the lease and be released. And even after they build the building, they can't assign and be released until the office tenant, who's already in the picture, who's already written into the lease, until that office tenant has been there for five years. Why is any of this relevant to whether it was a bona fide third party? It's totally relevant to the good faith. So that's a kind of lease restriction that the parties knew how to write to restrict the right to assign. And they didn't write that. Well, there's what's written and there's the implied. Well, my light is red. You can certainly answer her question. Okay. So the point is, why can't you apply something broader than what's already in 5.2? What's the reason? Because you have to look at the totality of expectations that the landlord has under all the provisions of the lease. And it's not just 5.2. Another provision that's incredibly relevant is Section 11.3. So, I mean, that's important, but I don't want to overstay my welcome. If you want to hear about that, I can explain the relevance of it. Well, you've got some time on your boat. Come back and visit with us again. I'll reserve for that, Your Honor. We'll hear from you then. Mr. Boss, we'll hear from you. Good morning. May it please the Court, my name is William Bosch. I am with Pillsbury Winthrop. I have been trial counsel. I've been with this case since 2017. I'd like to introduce my colleagues, Mr. Jeffrey Metzler and Thomas Howard, who is with me at trial. To reverse, appellants must overturn a unanimous jury verdict. I'm going to give you the same treatment I gave your counterpart on that. Tell us about this absolute. Why is absolute not absolute? Absolute means without landlord consent, Your Honor. But absolute doesn't say you have the absolute right to assign full stop. The conditions of this contract, specifically Section 12. What are the limitations? It has to be to a third party, and the provision of the contract says that the assignor is not released, or it says the assignor is released, so long as such third party assumes the obligation, so long as it is conditional. So here, I think, Judge Winn, you raised a number of the absurd extensions. So long as it's assumed at the beginning? Or is it sometimes after they actually assigned it, if they don't perform, then it doesn't? What it means is that the third party must actually be a real third party capable of assuming, not, in essence, the alter ego or, in this case, the instrumentality of the assignor. And I think, Judge Winn, you pointed out some of the absurdities that troubled Judge Mazzetti in evaluating this language in the abstract. I don't know if they're absurdities. They certainly are things that would indicate, you know, you've got something here that's probably not in the normal course of it. Absurdity? I mean, it is a legitimate corporation. It's just a question of how it's formed and how much of it is, in and of itself, a corporation, as opposed to something that's set up sort of as a straw man for a purpose that's not. Forgive me, Judge Winn. I meant the absurd examples of the minor or the person on the street, right? So those are the extreme examples that Judge Mazzetti asked counsel, is that your interpretation? And actually, during the course of this proceeding, that was their interpretation. But if we apply it to the facts of this case, Judge Mazzetti said, I'm going to allow you to present the facts of this case to the jury. You asked for a jury on all counts. And you get to present your theory that this shell entity, let's remember what it was. It was a, and we saw before, this is not a market transfer. What happened here was they actually tried to find a third party to acquire this leasehold interest. And that third party said, you must pay us, IWA, you must pay us $30 million for us to assume the remaining obligations of this ground lease. And it was then that IWA determined it needed an exit strategy, as their own documents showed. And what the record shows is how that scheme worked. What they did is they formed a shell company, RSD. They, IWA fully controlled that shell company. I don't think the facts are in dispute. I think the question is whether your friend on the other side suggests this is a common transaction, that this is common in the industry, and that it was not done in bad faith. The payments were made, the entity was capitalized sufficiently, and the payments were made in a timely manner. Well, so what the jury found was that the funding for three years, in fact, was part of the exit strategy. And recall that this entity was formed, and specifically it was contemplated, that the parties would hide the fact of the entity's control by IWA, the fact that there was funding by IWA only to get past the statute of limitations. But given what Judge Barnard articulated, why wasn't that a question of law? Why does it need to go to the jury? What's the question of fact that the jury decides? Well, there are three questions of fact that the jury could decide here. One is, even if you were to assume that the language is third party, did they comply with the conditions of the contract? And the jury here found that they did not, that this was not a bona fide, this was not a third party, given the facts of this assignment. But then you get beyond that, and there's always the question of bad faith. In the exercise of their discretion to exercise this absolute right, however it's defined, the Questar decision from the Maryland Supreme Court makes clear that in the exercise of a discretionary right, you still must act in good faith. And here the jury determined that with all the facts that are not in dispute, they acted in bad faith. Well, in our Kim opinion from 2024, we construed and applied the Maryland duty of good faith and fair dealing very narrowly. Why shouldn't that be its control here? The Kim decision, and specifically in footnote 15, recognized that this flavor of the implied duty of the covenant of good faith is still good law in Maryland. The specific questions raised in Kim were not the situation where a party is exercising a discretionary right. And so it's that flavor, both in Kim and in Walmart, this Court has recognized that that flavor of the implied and covenant of good faith survives. And let's recall the jury concluded. I'm not saying that this doesn't happen, but I'm a judge a long time, I haven't seen a contract that says an absolute right to assign. What was the purpose? I mean, how does that come about? You say you're here from inception. I'm not sure of your contract. I understand IWA, they were not the initial lessee in this verdict. Were they initially the parties involved in this, or did they get it as a result of someone else who simulates it? Yes, Your Honor. IWA acquired this, the loan, when it was already in default. And IWA made an investment decision. So getting to the initial contract here, this language is in here, typically there's no allegation of cohesion or anything like that that's going on here because you're pretty equal parties, I assume, with the initial one here. You're pretty sophisticated, and you put this language in there. Yes. Your Honor, even broad assignment rights, however, don't read out of the contract the obligation to act in good faith and not to commit fraud. And let's not forget the jury here found actual intent to defraud. It wasn't badgering. You see a language like this being put in a contract now? The word absolute, again, it wasn't absolute right to assign full stop. And what that absolute means in the context of this agreement is without landlord consent. So you do put that in contracts now. You would put contract with this same language in it right now. I don't think so, Your Honor. Because I'm here sitting here, as I said, since 2017. But the way the contract is read. The law is the law then. You didn't exactly. It's not an evolution of the law. Whoever did it backed in. We don't know any more than they did then. It's just, I don't know. I just say it doesn't look to me like a sophisticated party would put that in a contract. And, again, I come back to, I agree, Your Honor, in retrospect, absolute because it led to this question of the absurd examples. And then in this instance, it was an opportunistic view by them to exit. It was their exit strategy. But the reality is that they didn't comply with the conditions of the contract. It doesn't say absolute right to assign, again, full stop. It says to a third party. And a key point here is it's not just a contract. This is a ground lease. And as the Italian fishery case from the Maryland Supreme Court makes clear, a ground lease creates a property interest. That's why there is a fraud claim here. Because every conveyance with the intent to hinder, delay, or defraud under the statute is a fraud. You have to show actual intent, which we did here. And, again, unless no reasonable jury could find in favor of Plaza on the fraud or bad faith or any of the claims here, this verdict must stand. So unless there are any questions from the Court. Judge? Judge? Thank you very much for your argument. Thank you. We'll hear further from you, Mr. Getzendammer. Anna? Thank you, Your Honor. First of all, there is no fraud if the contract, as we contend, explicitly was designed to enable the leasehold lender to exit the leasehold. The bargain they made was we will pay any prior default to have this right, any prior default at the previous tenant. We will pay the rent to the penny while we hold the leasehold. But once that happens, we are off the hook. There's that provided however language in Section 19 of the estoppel agreement that makes that perfectly clear. So is it reasonable, is it fair to allow the assignment to a special purpose subsidiary that's capitalized with three years' rent? Let's flip it around and let me ask you this. Would it have been reasonable for Plaza and the original tenant to strike a ground lease deal that restricted the right of assignment with the condition that you assign to a sub and capitalize it with at least three years' worth of rent? Would that be a reasonable thing? Clearly it would. Well, if that is a reasonable arrangement and that is what IWA did here, there is no logical way you can find that to be a bad faith conveyance. Moreover, look at Section 11.3 of the ground lease. It talks about another remedy that the lender has in the event of its borrower's default, and that is to take a new lease. It's standard in the leasehold mortgage industry. I can either foreclose and take the leasehold or I can get a new lease from the landlord. And 11.3 says I can put it in a special purpose entity. It doesn't say anything about how much money that entity has to have. It doesn't say anything about the extent of control over that subsidiary entity. The contract expressly says that's okay. So if they didn't want that to happen, they could have they had sophisticated lawyers. They could have put a real restriction in the contract that prevents exactly the assignment that happened here, but they did the reverse. They put a provision in that blesses that kind of an assignment. Also, if the whole notion that fraud was found by the jury is totally tainted, because the question of whether the contract was breached is a question, purely a question of law, that the judge should have decided, should have instructed the jury, as we contend, that the assignment comports with the contract, that it doesn't violate the assignor's implied duty of good faith and fair dealing. Why not for the reason we just said? Because it's exactly the kind of assignment that was contemplated in the context of the whole lease, Anistopol Agreement. The rules of construction say you've got to look at the whole picture. When you do that, you see that this assignment was contemplated by the parties. So to call it fraud after the fact doesn't fly if, in fact, it's compliant with the contract. And for the judge to let the jury decide that it breached the contract takes everything that follows. Their whole case and this judgment is a house of cards. And there's one card that it relies on. And when you pull that card, everything falls to the ground. And that card is Section 6 of the final judgment, the requirement that any assignment must be made to a party, quote, table of performing, a meaningless term that the parties never contemplated. In fact, if you wanted to sit down and draft a provision, a restriction on the lease that was as polar opposite to the absolute right to assign as you could imagine, it would be what Judge Macedi drafted. The total, it's standardless, it's meaningless, it's impractical for the parties to employ. That's not the bargain that the leasehold lender made when he went into this arrangement. That's not what the estoppel agreement means. They never would have gotten a loan if they had that term in the contract. That's why the free assignment is in the ground lease. That's why in the estoppel agreement it hammers home. It expands. It's not just freely assignable. It's absolutely assignable. And provided, however, you're going to get a release as long as that ground rent is paid up to the date of your assignment. So that's why you should find as a matter of law that this assignment complied with IWA's obligations on the contract as a matter of law. My client is entitled to judgment as a matter of law on the breach of contract claim, a claim, by the way, that Plaza didn't even bring in this case. They didn't even say there was a breach of contract. The trial judge fought it up at a discovery hearing and said, I want you to tell me about the contract. I want you, you know, when they were fighting over this information that was exchanged, the judge said, you know, what does the contract say about this? Well, the contract doesn't say they have to give them anything except 10 days' notice of who the assignee is after the assignment. Another indication that the wherewithal of the assignee has nothing to do with limiting the right of assignment. It's just wrongheaded and so clearly wrongheaded. This case has to be reversed, reversed and not remanded, but reversed, because if you pull that card out, the whole house of cards falls down. Thank you, Mr. Gettys. Thank you, Your Honors. Thank you, both counsel, for your able argument. The wonderment of this case is the condition of the economic times. I'm from Raleigh, a property that sometimes is not profitable all of a sudden becomes very profitable. Perhaps I hope that this might flip and all of a sudden it's become so profitable that the other side said, hey, we're going to go with it, but we will answer your questions in due course. Our tradition here is we come down, we greet counsel, and then we proceed with the next case, and we'll do so now.
judges: James Andrew Wynn, Stephanie D. Thacker, Nicole G. Berner